## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| CHRISTIAN MAYO, <br><br> Plaintiff, <br><br> v. <br><br> ACOUSTICAL SHEETMETAL CO., LLC, <br><br> Serve: <br><br> Registered Agent <br> David H. Pettit <br> 530 East Main Street <br> Charlottesville, Virginia 22902 <br><br> Defendant. | Civil Action No: 2:21-cv-111 <br><br> **COMPLAINT**: American's with Disabilities Act – Discrimination, Retaliation <br><br><br><br> **Jury Trial Demanded** |

## COMPLAINT

Comes now the Plaintiff, CHRISTIAN MAYO (hereinafter "Plaintiff" or "Mr. Mayo"), and files this Complaint against Defendant, ACOUSTICAL SHEETMETAL COMPANY, LLC, (hereinafter "Defendant" or "Acoustical"), and moves this Court for entry of judgement in his favor against the Defendant, as set forth herein:

### NATURE OF THE ACTION

1. Plaintiff brings this action for damages and injunctive relief pursuant to the Defendant's violations of the American's with Disabilities Act 42 U.S.C. §§ 12111, *et seq.*, and to redress Defendant's deliberate and willful unlawful employment discrimination and retaliation against Plaintiff in violation of his federal rights.

2. This action against Defendant Acoustical arises from Defendant's unlawful discrimination against and retaliation against of Mr. Mayo through termination on account of his disabilities.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. § 1331, the Eastern District of Virginia has proper subject matter jurisdiction over this matter as it is a question of federal law.

4. Specifically, this matter concerns the violation and interpretation of the Americans with Disabilities Act 42 U.S.C. §§ 12111, *et seq.*,

5. The Eastern District of Virginia, Norfolk Division is the proper venue for this action pursuant to 28 U.S.C. § 1391(c)(2) and 28 U.S.C. § 1391(b)(1),(2) as it is the District and Division in which Defendant is incorporated and has a primary place of business at 2600 Production Road, Virginia Beach, Virginia 23454; and is the location at which the discriminatory practices were perpetrated, where the Plaintiff was employed by Defendant, and is convenient to the parties and witnesses.

## PARTIES TO THIS ACTION

6. Plaintiff, Christian Mayo, is a legal resident of the United States and a resident and domiciliary of Virginia Beach, Virginia.

7. At all times relevant to the allegations in this Complaint, Mr. Mayo was an employee of Defendant at 2600 Production Road, Virginia Beach, Virginia 23454.

8. Defendant, Acoustical Sheetmetal Company, LLC, is a corporation existing under and by virtue of the laws of the State of Virginia, organized in Virginia, with its principal place of business in Virginia Beach, Virginia.

9. Defendant employs approximately one hundred employees and is an employer as defined by the American's with Disabilities Act ("ADA"); 42 U.S.C. § 12111(5).

## PROCEDURAL REQUIREMENTS

10. On July 28, 2020, Plaintiff filed a charge of disability discrimination and retaliation in violation of the ADA with the Equal Employment Opportunity Commission ("EEOC"). Such charge was filed within one hundred eighty (180) days after the alleged unlawful employment practices in violation of 42 U.S.C. §§ 12111, *et seq.*, occurred.

11. The EEOC issued Mr. Mayo his Notice of Dismissal and Right to Sue on November 30, 2020. (See **Exhibit A –** Notice of Dismissal and Right to Sue)

12. The Complaint in this matter was filed with this Court within ninety (90) days from the receipt of the Notice of Dismissal and Right to Sue.

13. Mr. Mayo has complied with the ADA administrative requirements of 29 C.F.R. 1601.1 *et seq.* and, having met his procedural and administrative deadlines, has elected to bring the action privately.

14. Mr. Mayo has exhausted all available administrative remedies prior to bringing this suit.

## FACTUAL ALLEGATIONS

15. Mr. Mayo began employment with Acoustical on or about February 2018.

16. Mr. Mayo was employed as a welder/helper by Acoustical for the duration of his employment.

17. Mr. Mayo made approximately $540.00 per week.

18. He primarily welded and cut for the tank department under his team leader Alfonso Hinong ("Mr. Hinong").

19. Between February 2018 and October 2019, Mr. Mayo had received no negative performance reviews or received any complaints regarding his work or efficiency.

20. Mr. Mayo met or exceeded the employer's expectations for the duration of his employment, all negative comments made against Mr. Mayo were generated in retaliation for his lawful actions.

21. On October 16, 2019, Mr. Mayo was working with Mr. Hinong moving a pipe onto a pallet so that it could be cut and welded.

22. Forklifts are occasionally used to lift pipes for this process, however, the forklift was in use in a different warehouse while Mr. Mayo and Mr. Hinong were working.

23. Mr. Hinong verbally instructed Mr. Mayo to lift the pipe.

24. Mr. Mayo experienced a sudden pull and/or tear in his lower abdomen/groin area.

25. Mr. Mayo immediately notified Mr. Hinong, that he had been injured.

26. Mr. Hinong advised him to "just rest" and to do work for the remainder of the day without lifting.

27. Mr. Mayo followed Mr. Hinong's instructions and only welded and cut for the remainder of the day.

28. Despite informing his Team Leader, Mr. Mayo received no further instruction from Acoustical.

29. From the 17th of October until the 22nd of October Mr. Mayo wore a brace, and other team leaders at times permitted him to avoid any heavy lifting.

30. Acoustical, through Mr. Hinong and the other team leaders who directed Mr. Mayo's work, were aware of Mr. Mayo's injury.

31. On or about October 23rd, 2019, Mr. Mayo went to his Primary Care Physician, to have his injury diagnosed.

32. Dr. Menawat, Mr. Mayo's primary care physician, diagnosed Mr. Mayo with a groin strain. (See **Exhibit B** - Doctor Menawat Notes).

33. Mr. Mayo was given restricted return to work status by Dr. Menawat.

34. On account of his injury, Mr. Mayo was not able to lift or pull over 10lbs until he was cleared by his doctor.

35. Mr. Mayo suffered daily pain and discomfort on account of his injury.

36. Mr. Mayo was and remains unable to lift heavy objects on account of his injury, which significantly impairs his ability to perform many of the jobs he is qualified to perform, including construction.

37. This injury substantially hindered his ability to engage in a major life function, lifting anything of even moderate weight.

38. Despite returning to work, Mr. Mayo was affected by this disability from the time of occurrence to the present and has suffered subsequent reaggravations of his groin on account of the ongoing nature of his injury.

39. This injury is a qualified disability pursuant to the ADA.

40. Even with his disability, Mr. Mayo was still able to perform the essential functions of his job.

41. Mr. Mayo was employed, primarily, as a cutter and welder.

42. Neither cutting nor welding required lifting of any kind.

43. Lifting objects of moderate weight is a tangential function of Mr. Mayo's position at Acoustical, not an aspect of his essential functions.

44. Mr. Mayo was a qualified individual afforded protection under the ADA.

45. On October 23, 2019, Mr. Mayo went into the offices of Acoustical to ask his human resources officer, Robin Lee-Timmons ("Ms. Timmons") for reasonable accommodations.

46. Mr. Mayo made an appointment with Ms. Timmons through her receptionist and administrative assistant Marie Tunei ("Ms. Tunei").

47. While in the office, Mr. Mayo attempted to present his reasonable accommodation request to Human Resources from his primary care physician, requesting that he be given light work as his request for reasonable accommodation. (See **Exhibit C**– Note from Dr. Menawat).

48. Mr. Mayo was requested that, pursuant to Dr. Menawat's instructions, he be permitted to perform his welding and cutting tasks without being required to lift any objects over 10 lbs.

49. Mr. Mayo's request for accommodation was a simple one: permit him to do his job as described.

50. Ms. Timmons snatched the note from Mr. Mayo and began to berate him.

51. Ms. Timmons, the human resources manager at Acoustical, demeaned and blamed Mr. Mayo for having his disability, saying: "I told you not to get injured, goddamnit."

52. Ms. Timmons followed this exclamation with further profanities against Mr. Mayo and the position he was in.

53. Mr. Mayo's request was denied outright by Ms. Timmons.

54. Ms. Timmons, instead of engaging in the interactive process with Mr. Mayo shouted at and berated him for requesting accommodations.

55. Acoustical never engaged in the interactive process to determine what reasonable accommodations could be provided to Mr. Mayo for his disability.

56. Ms. Timmons instructed Mr. Mayo that he should go home and offered him no work pursuant to his requests.

57. Mr. Mayo was instructed that he would not be permitted to return to work until he no longer had any restrictions.

58. Acoustical had provided to another worker, a sheet metal cutter named "Maverick" light duty around the same time.

59. Maverick was injured but not disabled when he was given light duty work.

60. Other injured, but not disabled, workers regularly received light duty work as well.

61. After Mr. Mayo had returned from his disability, in December 2019, ASC gave light duty to another injured worker.

62. Accommodating Mr. Mayo by allowing him to do light work, of which there was plenty, would not have imposed any burden on Acoustical whatsoever, and yet they still denied his request for this reasonable accommodation.

63. Mr. Mayo continued to request light duty as a reasonable accommodation from Acoustical.

64. He messaged the Human Resources manager, Ms. Timmons, on Facebook, asking why he could not be put on light duty when Maverick, in crutches, was afforded that accommodation. (See **Exhibit D –** Facebook Message)

65. Neither Ms. Timmons, nor any other manager at Acoustical, ever responded to this inquiry.

66. Mr. Mayo followed up with phone calls to Acoustical human resources on November 1, 2019 and November 6, 2019, in an attempt to engage Acoustical in the interactive process and obtain his reasonable accommodations. (See **Exhibit E**– Phone Calls)

67. None of Mr. Mayo's phone calls were returned, Acoustical never attempted in good faith to engage in the interactive process with Mr. Mayo.

68. Through its human resources officers, Acoustical discriminated against Mr. Mayo continually by denying his requests for reasonable accommodations.

69. Mr. Mayo followed up with a specialist regarding his disability on November 15, 2019.

70. The specialist physician recommended that Mr. Mayo continue to be restricted at work and confirmed that his strained groin and continued need for rehabilitation.

71. After receiving confirmation of his diagnosis, Mr. Mayo went back to Acoustical seeking reasonable accommodations.

72. On November 23, 2019, Mr. Mayo was able to speak a believed owner of Acoustical, Ms. Margaret Shaia.

73. Ms. Shaia continued to deny Mr. Mayo light duty work then asserted that Mr. Mayo had failed to contact Acoustical regarding his injury.

74. Ms. Shaia's assertion was false and a blatant attempt to refuse Mr. Mayo his reasonable accommodations.

75. Acoustical had, prior to Mr. Mayo's meeting with Ms. Shia, filed his claim for Worker's Compensation with the Virginia Worker's Compensation Commission.

76. Ms. Shia, after denying knowledge of Mr. Mayo's injury, informed him that his Worker's Compensation Claim was denied.

77. Mr. Mayo had not yet contacted the Worker's Compensation Commission at that time.

78. Mr. Mayo's request for reasonable accommodations was denied and Ms. Shia told him go home.

79. On November 30, 2019, after having gone nearly a month and a half seeking and being denied light duty as reasonable accommodation, Mr. Mayo was called by Michelle Gartman ("Ms. Gartman") the company controller at Acoustical and told to return to work without restrictions.

80. Mr. Mayo had not yet received clearance from his doctors to return to work without restrictions.

81. Mr. Mayo had no source of income outside of Acoustical at the time.

82. In need of money, Mr. Mayo returned to Acoustical on December 2, 2019.

83. When Mr. Mayo returned, he was given a wire-brashing position by Mr. Paul Forosan ("Mr. Forosan") and Mr. Brandon Allen ("Mr. Allen"), floor managers at Acoustical.

84. Mr. Mayo was then given entry level work instead of his typical welding work but was still forced to lifting heavy objects despite his recent injury.

85. Mr. Mayo continues to experience pain, tension, and discomfort in his lower abdomen and back on account of his disability.

86. Acoustical's failure to even engage in the process of providing Mr. Mayo's reasonable accommodations is in violation of the ADA.

87. Mr. Mayo continued to work, avoiding heavy lifting where he could, at Acoustical from December 2019 until Acoustical terminated him in retaliation for his opposition to their discrimination against him.

88. Mr. Mayo continued to express his issues with how he was treated by Acoustical.

89. Due to his disability, and Acoustical's failure to accommodate his disability, Mr. Mayo worsened the injury in his groin while working at Acoustical. (See **Exhibit F** – Doctor's Note from March 2020)

90. Mr. Mayo reported this injury to Acoustical and expressed that he needed light duty work as a form of reasonable accommodation.

91. Mr. Mayo's request was granted in this instance, demonstrating that the granting of his reasonable accommodation was always possible.

92. Acoustical granted Mr. Mayo his accommodation too late, only after months of denying him and only after he was injured even worse by performing non-essential functions that aggravated his disability.

93. Mr. Mayo again further aggravated his disability and pulled his back on April 15, 2020 lifting angle bars pursuant to his full duty.

94. Mr. Mayo went to Patients First to have his injury examined on April 16, 2020.

95. Patients First contacted Acoustical, through Ms. Sharelle-Rose, to inform them that Mr. Mayo was injured on April 15, 2020..

96. Acoustical realized, after this incident, that Mr. Mayo would cost them too much money with his disability to be worth employing.

97. Acoustical subsequently, began a process of setting Mr. Mayo up for termination on account of his disability.

98. Acoustical, on April 17, 2020, issued Mr. Mayo a "final warning" regarding his "fail[ure] to report injury incidents to his supervisor…" (See **Exhibit G –** Final Warning)

99. Mr. Mayo had never received any prior warnings, verbal or otherwise, before this "final warning."

100. In addition to noting that he had failed to notify a supervisor of an injury from April 15th, 2020, the final warning stated that he had failed to notify his supervisor related to the October 16th, 2019 incident. *Id.*

101. As Acoustical notes, employees are to "report any…job-related injury, near miss or incident to your immediate supervisor **or** ASC management immediately." *Id.* (Emphasis added).

102. None of the warnings issued to Mr. Mayo by Acoustical indicated that they could result in his dismissal

103. Mr. Mayo, cognizant that Acoustical was discriminating against him on account of his disability, decided to report the discrimination to the EEOC.

104. On April 20, 2020, Mr. Mayo reported Acoustical's discrimination to the EEOC. (See **Exhibit H –** EEOC Charge)

105. Mr. Mayo's charge included Acoustical's failure to provide reasonable accommodations following his October 16, 2019 injury.

106. Mr. Mayo engaged in a protected activity in opposition to unlawful practices by reporting the failure to reasonably accommodate to the EEOC on April 20, 2019.

107. On April 20, 2020 Mr. Mayo forwarded a copy of his charge his employer.

108. Ms. Shaia confirmed receipt of Mr. Mayo's charge by Acoustical through counsel on April 22, 2020.

109. Acoustical, following Mr. Mayo's opposition to their discrimination, executed a plan to terminate Mr. Mayo in retaliation for his reporting.

110. On May 7, 2020, following Mr. Mayo's filing of his original EEOC charge, Acoustical issued Mr. Mayo 4.5 demerit points.

111. Mr. Mayo had taken no activity that would have warranted the issuance of such demerit points to his record, as he had received doctor's notes and excuse slips for all of his absences.

112. On May 8, 2020, in an effort to understand why he was being issued demerits, Mr. Mayo spoke to Michelle Gartman and Sharell Rose regarding his demerits.

113. Mr. Mayo provided doctors' notes explaining the absences and tardiness for which the demerits were supposedly generated.

114. Ms. Gartman and Ms. Rose, after speaking with Mr. Mayo, reduced his demerits, but did not eliminate them entirely despite absence slips being produced.

115. Additionally, the new lower demerit point slip was generated for the previous day.

116. Mr. Mayo, suspectecting that ASI would use the higher demerit point figure unless the lower demerits were post-dated, refused to sign for this form until he received a demerit slip dated May 8, 2020.

117. These demerits were not tied to any action or omission by Mr. Mayo that should cause demerits to be generated.

118. The demerits were simply added to his record for the purpose of generating a pretextual reason for Mr. Mayo's eventual termination.

119. After April 20, 2020, Mr. Mayo began to receive negative comments and derisive looks from managers at Acoustical.

120. Mr. Allen would require Mr. Mayo to show up to work at 5 a.m. when his starting time per the schedule was 8am. Mr. Allen and Acoustical did not credit Mr. Mayo with this working time.

121. Alex Sadural, a supervisor at Acoustical, assigned Mr. Mayo clean-up duty.

122. Mr. Mayo had never worked clean-up duty and such activities were outside of his typical job responsibilities.

123. On May 13, 2020, Mr. Mayo was approached by Aldrin Escobar ("Mr. Escobar").

124. Mr. Escobar asked Mr. Mayo to help him unload a truck.

125. Mr. Mayo informed Mr. Escobar at that time that he was on light duty and not allowed to work outside.

126. Mr. Escobar responded by stating it would be light work commiserate with his needs on account of his disability.

127. Mr. Mayo, acting under the direction of a supervisor and as he was told, proceeded to unload the truck.

128. Mr. Mayo was not given any assistance and told to unload the entire truck.

129. Mr. Mayo's disability became aggravated by the activity that was far in excess of his restrictions and requested reasonable accommodations.

130. Mr. Escobar was acting on behalf of Acoustical when he directed Mr. Mayo to unload the truck.

131. Acoustical knew or should have known that such activity would result in the reaggravation of Mr. Mayo's injury.

132. Acoustical that same day became aware of Mr. Mayo's injury through Ms. Margaret, Mr. Forosan, and Mr. Allen—all of whom were floor managers or supervisors at Acoustical.

133. Mr. Mayo was commanded to go home that day and was given no paperwork.

134. On May 15, 2020, Mr. Mayo was called into the office to meet with the owner of Acoustical and a manager.

135. Mr. Mayo was told that he was being terminated for "insubordination." (*See* **Exhibit I –** Termination Notice).

136. Mr. Mayo was accused of insubordination for unloading the truck that he was directed to unload by Mr. Escobar.

137. Mr. Mayo explained that he had simply been obeying the orders of Mr. Escobar when unloading the truck.

138. The directors and officers of Acoustical knew that Mr. Mayo was acting pursuant to instructions and had set him up with unloading the truck alone in order to invent a cause for Mr. Mayo's termination.

139. Acoustical, through its employees, officers, and agents executed a scheme of retaliation against Mr. Mayo that ultimately resulted in his termination.

140. Relying on baseless demerits, a "final warning" that was the first warning of any kind to Mr. Mayo, and his supposed "insubordination" Acoustical terminated Mr. Mayo for "cause."

141. Mr. Mayo was discriminated against on account of a disability by Acoustical when they denied him reasonable accommodations.

## COUNT I: DISABILITY DISCRIMINATION FAILING TO REASONABLY ACCOMMODATE

142. Plaintiff reasserts and affirms the statements made in paragraphs 1-141.

143. Plaintiff is a qualified disabled individual.

144. Plaintiff was diagnosed with a groin strain and hernia on October 16, 2019.

145. Plaintiff was and remains unable to lift even moderately heavy objects.

146. Plaintiff was able to perform the essential functions of his position, even with his disability, which were to cut and weld as directed.

147. Lifting objects is only tangential to Plaintiff's job, not essential.

148. Defendant was aware of Plaintiff's injury from October 23, 2019 at the latest onward.

149. Plaintiff engaged in the interactive process in an attempt to obtain a reasonable accommodation from Defendant.

150. Plaintiff requested that he be allowed to work without lifting heavy objects, namely at cutting and welding.

151. Cutting and welding were the primary functions of Plaintiff's job and Defendant could provide this accommodation without undue hardship.

152. Plaintiff attempted to procure reasonable accommodations at least four times between his injury and December 2019, twice in person and twice via phone calls. (See **Exhibit E**)

153. Defendant refused to engage in good faith with Plaintiff during the interactive process.

154. Defendant summarily refused Plaintiff's request for reasonable accommodation without engaging in the interactive process.

155. Defendant could provide the accommodations requested by Plaintiff without undue hardship.

156. Defendant had plenty of work that Plaintiff could perform within his restrictions.

157. Plaintiff, after returning to work in December 2019 on unrestricted status, performed only the light duty work that he was able to with his disability as provided by his team leaders.

158. Defendant had no issue with Plaintiff's performance from December 2019 onward despite his working at light duty.

159. The availability of light duty work, and Defendant's refusal to even engage with Plaintiff's requests, demonstrate that Defendant willfully violated Plaintiff's rights.

## COUNT II: RETALIATION

160. Plaintiff reasserts and affirms the statements made in paragraphs 1-159.

161. Plaintiff was discriminated against on account of his disability as described in Count I.

162. Plaintiff was denied reasonable accommodations from October to December 2019.

163. Plaintiff endured this discrimination on account of his fear of losing his job.

164. On or about April 20, 2020, Plaintiff filed a claim of discrimination on account of Defendant's failure to reasonably accommodate with the EEOC. (See **Exhibit H**).

165. On or about April 22, 2020 Defendant acknowledged receipt of Plaintiff's EEOC charge through Ms. Shaia.

166. Plaintiff notified the Defendant of the charge on the same day that it was filed.

167. Defendant subsequently began retaliating against Plaintiff in an effort to eventually retaliate against him by termination.

168. Defendant created "demerits" and applied them against Plaintiff.

169. When Plaintiff questioned these demerits, Human Resources officers Ms. Gartman and Ms. Rose, lowered, but did not eliminate the demerits.

170. No explanation was ever given for the existence of the demerits or the reduction.

171. These demerits were entirely fabricated by Defendant to use in a record against Plaintiff.

172. Plaintiff, though on light duty on account of a workplace injury, was told by Mr. Escobar—a supervisor—that he was to unload a truck with help.

173. When Plaintiff arrived to unload the truck there was no one to help him.

174. Plaintiff was informed by Mr. Escobar that his job was to unload the truck.

175. Plaintiff felt pain and aggravation in his groin on account of his disability when he did so.

176. Plaintiff reported this pain to Defendant.

177. Defendant accused Plaintiff of insubordination for unloading the truck despite being on light duty work.

178. Defendant called Plaintiff into the office and terminated him for insubordination on May 15, 2020.

179. Defendant had set up the events leading to Plaintiff's termination in order to retaliate against him for reporting their discriminatory practices to the EEOC.

180. Plaintiff was able to perform the essential functions of his position at the time he was terminated.

181. Plaintiff had received random demerits and warnings without explanation immediately prior to his termination—following his reporting of discrimination to the EEOC.

182. Defendant's reason for termination is pretextual, as Plaintiff's "insubordination" was following the orders of one of Defendant's managers. (See **Exhibit I**)

183. The reasoning provided by Defendant for Plaintiff's termination is false, the timing of the adverse employment actions against him, and the deliberate planning of Plaintiff's alleged "insubordination" demonstrate that his termination was directly linked to his EEOC reporting.

184. Plaintiff was terminated on account of his opposition to Defendant's unlawful discrimination on account of disability.[1]

---

[1] "In order to establish a prima facie case of retaliation, a plaintiff must allege (1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgement against the Defendant as follows:

1. Appropriate declaratory relief declaring the acts and practices of Defendant to have been in violation of Mr. Mayo's rights as secured by the American's with Disabilities Act 42 U.S.C. §§ 12111, *et seq.*;

2. Permanently enjoin Defendant, its assigns, successor, agents, employees, and those acting in concert with them from engaging in discrimination against employees;

3. For appropriate actual damages against Defendant for violations of the ADA in amounts no less than:

    a. $25,000 in back pay from the time of termination to the present;

    b. $5,000 in lost benefits from the time of termination to the present;

    c. $30,000 in front pay

4. For punitive damages against Defendant for willful discrimination under Count I of this Complaint in violation of the ADA in an amount no less than $350,000;

5. For punitive damages against Defendant for willful retaliation under Count II of this Complaint in violation of the ADA in an amount no less than $350,000;

6. For compensatory damages for pain and suffering, humiliation, loss of enjoyment, and inconvenience in the amount no less than $100,000;

7. For all other wages and benefits lost or denied;

8. For an award to Plaintiff of his reasonable attorney's fees, and costs incurred in this action, together with expert witness fees and expenses;

9. For an award of any additional amounts necessary to offset the adverse tax consequences of an award received in a lump sum;

10. For an award of pre-judgement and post-judgement interest on any monetary award; and

11. For an Order of any other relief this Court deems to be just and proper.

## DEMAND FOR JURY TRIAL

12. Mr. Mayo, pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demands a trial by jury in this action for all claims so triable.

Respectfully Submitted,

CHRISTIAN MAYO


_____/s/_____
Brandon T. Bybee (VSB# 92140)
William B. Barteau (VSB# 93381)
BRANDON T. BYBEE, P.L.C.
P.O. Box 9528
Norfolk, VA 23505
Tel: (757) 568-0090
Fax: (866) 568-0090
brandon@bybeelegal.com
william@bybeelegal.com
*Counsel for Plaintiff*